OPINION
{¶ 1} Mack Trucks, Inc. ("Mack"), appellant, appeals from a judgment of the Franklin County Court of Common Pleas, in which the court affirmed an order of the Motor Vehicle Dealers Board ("board"), appellee, that upheld the protest filed by Toledo Mack Sales Service, Inc. ("Toledo Mack"), appellee.
 {¶ 2} Mack manufactures truck chassis and parts, which it sells mainly through franchise dealers. Toledo Mack is a Mack franchise owned by Dave and Sally Yeager. The Yeagers operated a different Mack franchise from 1982 to 1986, and then opened the Toledo Mack franchise in 1986 pursuant to a distributor agreement. According to Toledo Mack, its positioning as a discount seller and its nationwide sales efforts angered various Mack dealers, as well as Mack executives.
 {¶ 3} In February 1986, Mack sent a letter to Toledo Mack requesting that it cease using a certain advertisement Mack claimed was offensive. Mack required Toledo Mack to get Mack's approval for all advertisements thereafter. However, in 2001, Toledo Mack began another line of advertising to which Mack objected and continued to run the advertisements even after Mack told it to stop.
 {¶ 4} PAI Industries ("PAI") sells and manufactures truck parts, including genuine and imitation Mack parts. For years, PAI was Toledo Mack's largest purchaser of Mack parts, although PAI purchases Mack parts from other Mack dealers, as well. PAI purchases the Mack parts not only for resale, but to reverse engineer the parts and create imitation parts.
 {¶ 5} As a franchisee, Toledo Mack receives from Mack master price lists that contain the net cost of 44,000 Mack parts. On the top of each page of the price list is the following statement:
CONFIDENTIAL — This material, and the content thereof, is owned by Mack Trucks, Inc. and is provided to authorized Mack Distributors and Service Dealers with the express understanding that it will not be copied or made available to others for any purpose except as authorized by Mack Trucks, Inc.
Toledo Mack supplied these price lists to PAI for several years.
 {¶ 6} Further, Mack has a parts assembly database that contains specifications for approximately one million different vehicles. The database shows which parts are on each vehicle and how those parts uniquely fit together, which is necessary because each Mack truck is custom built. The database also explains which parts have been updated or replaced with newer parts. Originally, this list was compiled on microfiche. The order form for the microfiche contains a confidentiality statement that indicates a violation of confidentiality may result in the prohibition against purchasing future microfiche releases. Toledo Mack sold microfiche copies of the parts database to PAI for several years.
 {¶ 7} The microfiche system was eventually replaced by a computerized system MACSPEC, and then later, MACSPEC II. To receive MACSPEC II, Mack dealers were required to sign a license agreement. On February 1, 2001, Toledo Mack returned its MACSPEC II system to Mack for a 27-disk MACSPEC 2001 system, which was the same system as MACSPEC II, except it ran under newer versions of Microsoft Windows. On January 29, 2002, Mack sent a letter to all Mack dealers informing them that the microfiche was being discontinued and that the MACSPEC 2001 system would replace it. The letter also indicated the following, in pertinent part:
* * * If you have a Parts/Service Dealer or customer(s) that utilizes this information, they may wish to order a MACSPEC 2001 system for their location. * * * There are several Parts/Service Dealers and customers that already utilize the MACSPEC 2001 system and there will be no change or additional charges to you for these locations.
Toledo Mack's parts manager, Jim Toth, called Mack and confirmed that the MACSPEC system could be offered to "customers," and Mack confirmed such. Toth then offered the MACSPEC 2001 to PAI and Northwest Truck Sales (PAI's Edmonton, Canada dealer) ("Northwest"), among others. PAI and Northwest purchased MACSPEC 2001 systems.
 {¶ 8} In addition, at some point within the last several years, Mack identified its largest buyers of trucks, labeled them "National Accounts," and began selling trucks directly to these entities at prices below what the franchise dealers could sell them for. On July 1, 2002, Toledo Mack filed an action against Mack in the United States District Court for the Eastern District of Pennsylvania ("federal action"), alleging antitrust claims and state statutory and common law claims.
 {¶ 9} On July 24, 2002, a woman, Yolanda May, called the MACSPEC 2001 help desk, which is operated by GGS Information Services, Inc. ("GGS"). The woman stated she was from "Nancy's Trucking" and indicated she was having trouble running her MACSPEC 2001 system. When the help desk worker, Bill Black, called May on the telephone the next day to confirm her receipt of a replacement disk, May put the worker on hold, at which time Black heard a PAI commercial. After further investigation, Black determined that Nancy's Trucking and PAI had the same phone number and address. Black called May back, and May told Black her employer had received the MACSPEC 2001 system from Toledo Mack.
 {¶ 10} In November 2002, Mack reached a partial settlement with Toledo Mack and PAI in the federal action. PAI paid money to Mack, returned the MACSPEC 2001 system and price lists to Mack, and agreed to not possess or use these materials in the future. Toledo Mack then agreed to stop disseminating the information at issue herein during litigation and return the MACSPEC 2001 system it had provided to Northwest.
 {¶ 11} On March 27, 2003, Mack issued a letter to Toledo Mack terminating its franchise based upon breaches of the distributor agreement and violations of trust. The letter cited several reasons for the terminations, including the following, which are germane to the present appeal: Toledo Mack sold information to PAI; Toledo Mack created advertisements that misused and undermined the value of Mack's trademarks and brand names; and poor sales performance. Mack also filed a counterclaim against Toledo Mack and a third-party claim against PAI in the federal action.
 {¶ 12} Toledo Mack filed with the board a protest to the termination pursuant to R.C. 4517.54(C). In February and March 2004, the matter was heard before the board's hearing examiner. On July 30, 2004, the hearing examiner issued a report recommending that the board sustain Toledo Mack's protest, finding that Mack's price and parts lists were not trade secrets and the relationship between Mack and Toledo Mack was not one requiring Toledo Mack to keep the information confidential. The board adopted the hearing examiner's report by failing to act within 30 days thereafter.
 {¶ 13} Mack appealed the board's action to the Franklin County Court of Common Pleas. On May 16, 2005, the court issued a decision affirming the board's action. The trial court examined the factors in R.C. 4517.55(A)(1) through (9) that are used to determine whether there was good cause for a termination. The court found that, although it could be viewed that Toledo Mack improperly sold confidential information to PAI, and both PAI and Toledo Mack tried to conceal such from Mack, there was evidence to the contrary that the information Toledo Mack provided to PAI should be a trade secret. The court noted that Mack gave total authority to its dealers to provide information and costs to other parties and failed to safeguard the information. Mack failed to protect the information by written restriction whether by the dealership agreement or license agreement, and it maintained no tracking system for computer systems shipped. The court also found that, although the hearing examiner did not address the issue of the offensive advertising as a ground for termination, it did not find the advertisements rose to the level of good cause. As to the other factors in R.C. 4517.55, the court generally found there was no evidence to support any of these factors and that Mack lacked good cause to terminate the franchise agreement.
 {¶ 14} The trial court journalized its judgment on June 23, 2005. Mack has appealed the court's order, asserting the following assignments of error:
1. The court below erred as a matter of law and fact in holding, at pages 10-13 of its Decision on Merits of Appeal, that Mack Trucks, Inc. ("Mack") lacks Ohio Revised Code § 4517.55(A) "good cause" to terminate a dealer, Toledo Mack Sales Service, Inc. ("Toledo Mack"), that systematically provided Mack's confidential parts price lists and databases to Mack's biggest parts competitor, which in turn utilized such confidential information to the detriment of Mack and its other dealers.
2. The court below erred in holding, at page 13 of its Decision on Merits of Appeal, (based on the court's conversance with "television advertisements in the Central Ohio area") that Toledo Mack's admitted recurrent and tasteless use of Mack's trademark following "cease and desist" letters and in violation of the dealer agreement does not constitute § 4517.55(A) "good cause" for termination by Mack.
3. The court below erred in holding, at Pages [sic] 13-14 of its Decision on Merits of Appeal, that several express §4517.55(A) factors did not also (independently and separately) support Mack's termination of Toledo Mack.
 {¶ 15} Mack argues in its first assignment of error that the trial court erred in finding that there was a lack of good cause to terminate Toledo Mack because Toledo Mack systematically provided confidential parts price lists and databases to PAI. Specifically, Mack asserts it had good cause to terminate Toledo Mack's franchise based upon the following three acts: (1) Toledo Mack provided price lists showing dealer cost for parts to PAI in 1996, 1997, 1999, and 2001; (2) Toledo Mack provided the microfiche containing the specifications of almost every Mack vehicle to PAI, Northwest, and Illinois Diesel Parts Center from 1996-2001; and (3) Toledo Mack provided to PAI and Northwest copies of the MACSPEC 2001 system.
 {¶ 16} When a common pleas court reviews an order of an administrative agency, the common pleas court must consider the entire record to determine whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. R.C. 119.12; Univ. of Cincinnati v.Conrad (1980), 63 Ohio St.2d 108. The common pleas court's "review of the administrative record is neither a trial de novo
nor an appeal on questions of law only, but a hybrid review in which the court `must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.'" Lies v. Ohio Veterinary Med.Bd. (1981), 2 Ohio App.3d 204, 207, quoting Andrews v. Bd. ofLiquor Control (1955), 164 Ohio St. 275, 280. The common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, but the findings of the agency are not conclusive. Univ. of Cincinnati, at 111.
 {¶ 17} An appellate court's review of an administrative decision is more limited than that of a common pleas court. Ponsv. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621. Unlike the court of common pleas, a court of appeals does not determine the weight of the evidence. Rossford Exempted Village SchoolDist. Bd. of Edn. v. State Bd. of Edn. (1992),63 Ohio St.3d 705, 707. In reviewing the court of common pleas' determination that the agency's order is or is not supported by the requisite quantum of evidence, the appellate court's role is limited to determining whether the court of common pleas abused its discretion. Hartzog v. Ohio State Univ. (1985),27 Ohio App.3d 214, 216. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. However, an appellate court does have plenary review of purely legal questions.Steinfels v. Ohio Dept. of Commerce, Div. of Securities (1998),129 Ohio App.3d 800, 803.
 {¶ 18} R.C. 4517.54(A) provides that, "[n]otwithstanding the terms, provisions, or conditions of an existing franchise, no franchisor shall terminate or fail to continue or renew a franchise except for good cause." Prior to the effective date of the proposed action, a franchisee receiving written notice from a franchisor proposing to terminate, discontinue, or not renew a franchise may file a protest with the board against the franchisor's proposed action. R.C. 4517.54(C). R.C. 4517.55
provides as follows with regard to good cause for termination:
(A) In determining whether good cause has been established by the franchisor for terminating or failing to continue or renew a franchise, the motor vehicle dealers board shall take into consideration the existing circumstances, including, but not limited to:
(1) The amount of retail sales transacted by the franchisee during a five-year period immediately preceding such notice as compared to the business available to the franchisee;
(2) The investment necessarily made and obligations incurred by the franchisee to perform its part of the franchise;
(3) The permanency of the franchisee's investment;
(4) Whether it is injurious or beneficial to the public interest for the franchise to be modified or replaced, or the business of the franchisee disrupted;
(5) Whether the franchisee has adequate motor vehicle sales and service facilities, equipment, vehicle parts, and qualified service personnel to reasonably provide for the needs of the consumers for the motor vehicles handled by the franchisee, and is rendering adequate service to the public;
(6) Whether the franchisee fails to fulfill the warranty obligations of the franchisor required to be performed by the franchisee;
(7) The extent and materiality of the franchisee's failure to comply with the terms of the franchise and the reasonableness and fairness of the franchise terms;
(8) Whether the owners of the new motor vehicle dealer had actual knowledge of the facts and circumstances upon which termination is based;
(9) Whether the proposed termination constitutes discriminatory enforcement of the franchise agreement.
 {¶ 19} The non-limiting language of R.C. 4517.55(A) makes apparent that the list included in R.C. 4517.55(A) is not exhaustive, and all "existing circumstances" must be taken into account in determining whether good cause exists. As Mack points out, this court has before found good cause to terminate based upon a dealer's felony conviction for a crime involving moral turpitude, which undermined the trust between the manufacturer and the dealer, and between the public and the dealer, Gen.Motors Corp. v. Monte Zinn Chevrolet Co. (2000),136 Ohio App.3d 157, and, based upon pervasive fraud in a dealer's service department, Chesapeake Ford, Inc. v. Ohio Motor Vehicle DealersBd. (1995), 103 Ohio App.3d 515.
 {¶ 20} In the present case, Mack relies upon Monte ZinnChevrolet and Chesapeake Ford to argue that the three acts committed by Toledo Mack, as explained above, constituted acts of dishonesty and fraud, which undermined the trust between Mack and Toledo Mack and between the public and Toledo Mack. We first note that this court has found that R.C. 4517.55 does not require express consideration of each of the enumerated circumstances, and any one factor is sufficient to support a good cause determination. See Chesapeake Ford, at 521. Thus, any one of the three acts committed by Toledo Mack may, independently, support good cause for termination of Toledo Mack's franchise.
 {¶ 21} We will first address Mack's contention regarding the MACSPEC 2001 system, as we find Toledo Mack's actions with respect to the MACSPEC 2001 constituted good cause for termination. Mack maintains that MACSPEC 2001 was a trade secret, the providing of which to PAI and Northwest constituted a violation of trust and confidentiality. We agree. A trade secret is defined in R.C. 1333.61(D), which provides:
(D) "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
 {¶ 22} In determining the existence of a trade secret, the trial court must consider: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information withheld from competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate. Procter Gamble Co. v. Stoneham (2000),140 Ohio App.3d 260, citing Pyromatics, Inc. v. Petruziello (1983),7 Ohio App.3d 131, 134-135. The court must balance the conflicting rights of an employer to enjoy the use of secret processes and devices which were developed through its own initiative and investment and the right of employees to earn a livelihood by utilizing their personal skill, knowledge, and experience. Valco Cincinnati, Inc. v. N D Machining Service,Inc. (1986), 24 Ohio St.3d 41, citing GTI Corp. v. Calhoon
(S.D.Ohio 1969), 309 F.Supp. 762, 768. These two interests may be balanced by distinguishing between knowledge and skill that is general in the trade and secret knowledge acquired particularly from the employer. Id.
 {¶ 23} In the present case, the MACSPEC 2001 system satisfies both requirements of a trade secret found in R.C. 1333.61(D). The MACSPEC 2001 is a computer program that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. The MACSPEC 2001 system contains specifications of nearly every Mack vehicle. Every Mack vehicle is custom produced to the individual customer's specifications; thus, without knowing which parts are used and how the parts fit together in any particular custom vehicle, PAI would be unable to determine which parts are necessary to repair a Mack owner's vehicle. The economic value of the MACSPEC 2001 system is patently derived from a competitor's difficulty in servicing a customer's Mack vehicle without the system, while a Mack dealer with the MACSPEC 2001 would be able to determine the necessary parts and how they fit together instantly via access to the assembly record for the customer's particular vehicle. Robert Yuzuick, Mack's manager of publications, testified the MACSPEC 2001 was "extremely valuable" and was the "heart" of Mack's database. He demonstrated that the MACSPEC 2001 had numerous tools — such illustrations of the parts on each specific vehicle, a virtual magnifying glass for the intricate details, and a super-session capability to recognize updated parts — that allow the user to quickly identify the needed parts for each unique customer. The MACSPEC 2001 also permits the user to identify which parts on the vehicles are the most popular parts, allowing a competitor to determine which imitation parts would be most profitable to reverse engineer. Yuzuick said the system cost $34 million to develop and would be extremely valuable to a competitor. Glenn Murphy, an operations manager at Nex-Tran Truck Center, which is an authorized Mack dealer, agreed that dissemination of the MACSPEC 2001 program to non-authorized service dealers would be harmful to Mack and its dealers. Kevin Flaherty, Mack's senior vice-president of sales, testified that divulging the MACSPEC system to a competitor would cause significant and possibly irreparable economic harm to Mack. Toledo Mack's parts manager, Jim Toth, also admitted that having access to the information contained in the MACSPEC 2001 system would help PAI compete with Mack.
 {¶ 24} Further, the evidence was clear that the MACSPEC 2001 system was not readily obtainable via proper means by PAI or Northwest. Yuzuick testified that the MACSPEC 2001 system was not available for purchase over the Internet or to the public, all distribution of the program was through him personally, and its distribution is very controlled so it does not "float anywhere." He stated that, when a dealer requests a new program, he submits the dealer's request to the MACSPEC 2001 vendor, GGS, who then logs the request so it knows the dealer is authorized to receive the program and so additional billing is recorded. Yuzuick stated that, on the order form for the MACSPEC 2001, a dealer may request the program be sent either directly to the dealer or to its service dealer, but he would have never filled an order for Toledo Mack to have a copy mailed to PAI, and PAI was never indicated on Toledo Mack's order form. Thus, it is apparent that the system was not readily obtainable except through the proper means of submission by the dealer and approval by Yuzuick.
 {¶ 25} In addition, the MACSPEC 2001 system was the subject of efforts that were reasonable under the circumstances to maintain its secrecy. In addition to the procedure outlined by Yuzuick, as explained above, he also testified that the opening screen of the program contained a statement that indicated the unauthorized use, production or distribution of the program, or any portion of it, may result in severe civil and criminal penalties, and it would be prosecuted to the maximum extent possible under law. Also, after the install wizard installed the program on the computer, an "unlock screen" appeared, which indicated a registered key number. The user would then telephone GGS, who would ask for the registration number, then use that number to generate a random, unique unlock code, which GGS would then use to unlock the program for the user. Yuzuick stated that GGS will only unlock a program for a user that has submitted a license agreement that GGS keeps on file. Yuzuick then testified that, if a user needs a new unlock code, the user must submit a request with the reasons for needing a new code and evidence to substantiate the reasons, e.g., a copy of the receipt for a new computer the user bought.
 {¶ 26} Yuzuick also testified that, although no MACSPEC 2001 license agreements were executed when distributing MACSPEC 2001 and no letter was ever issued stating MACSPEC 2001 was proprietary and confidential, he considered the MACSPEC 2001 license agreement to be merely a continuation of the license agreement signed by users of the MACSPEC II, as MACSPEC 2001 was the same as MACSPEC II except it could be run on the newer Windows versions. The license agreement for MACSPEC II indicated that the MACSPEC software must be treated as confidential and proprietary, and the user could not permit access of the software to anyone other than an authorized employee or Mack authorized representative without written approval from Mack. When MACSPEC 2001 was ready for shipment, Mack issued letters to the users of the MACSPEC II, told them to return their copies of MACSPEC II, and they would no longer be charged for its use, thereby acknowledging that the license agreement for the MACSPEC system was not being terminated, only the billing for the older version. Yuzuick's testimony confirmed that the licensing agreement from MACSPEC II was never cancelled; only the monthly fees and updates were cancelled. Thayer Dolan, staff attorney for Mack, similarly testified that it was his understanding that the license agreement for the MACSPEC II was not cancelled when MACSPEC 2001 was released; only the MACSPEC II system was cancelled. Glenn Murphy also testified he considered MACSPEC 2001 to be governed by the MACSPEC II license agreement. When Murphy signed the initial agreement with MACSPEC, he believed the license agreement to be for all MACSPEC systems and updates thereafter, regardless of whether it was a new version of the system. Yuzuick also explained that, although a form used by GGS to report when the users returned their MACSPEC II systems had a column labeled "date license cancelled," it referred only to the date the system and monthly fees were cancelled, not the actual license. Also, it is significant that this form was created by GGS, not Mack, so any wording used on the form cannot be imputed to Mack. Toledo Mack failed to present any contrary evidence as to the continuation of the license agreement from the MACSPEC II to the MACSPEC 2001.
 {¶ 27} A major point of contention was the January 29, 2002 letter Mack sent to all Mack dealers informing them that the microfiche was being discontinued and that the MACSPEC 2001 system could be ordered to replace it. As quoted previously, the letter indicated the following, in pertinent part:
* * * If you have a Parts/Service Dealer or customer(s) that utilizes this information, they may wish to order a MACSPEC 2001 system for their location. * * * There are several Parts/Service Dealers and customers that already utilize the MACSPEC 2001 system and there will be no change or additional charges to you for these locations.
Although Toledo Mack attempted to argue that "customers" included PAI and Northwest, this claim is unpersuasive in light of the evidence submitted. Yuzuick testified that "customers" meant only authorized Mack dealers, including authorized parts stores, which he considers customers of Mack and the dealers. He stated it is apparent that "customers" meant only authorized dealers because the subject heading of the letter referred to "MAC-RO, super session and VRI," which were what Mack was canceling and which were subject to a confidentiality statement that these could be used only by authorized parts stores and authorized dealers. Dolan similarly testified that, after speaking with Mack employees, he determined that the use of the word "customer" in the January 2002 letter meant an authorized Mack representative. In further support of its definition of "customer," Mack presented the testimony of Murphy, the operations manager at Nex-Tran Truck Center, who stated he considered the MACSPEC 2001 to be confidential and proprietary and would consider PAI a competitor, not a customer. Murphy did not understand Mack's January 2002 letter to authorize the dealers to give the system to PAI, and he believed the correspondence permitted the dealers to purchase MACSPEC 2001 for only authorized service dealers, whom he considered "customers."
 {¶ 28} More damning to Toledo Mack's claims with regard to whether PAI could be considered a "customer" of Mack was the testimony of Toledo Mack's parts manager, Jim Toth. Toth stated that he believed someone would have to have a "screw loose" to put in Mack's January 2002 letter that dealers may wish to order the MACSPEC 2001 for Mack's "competitors." He agreed that for Mack to permit a competitor to purchase MACSPEC 2001 would not make any sense and would be absurd. Toth then specifically conceded that he viewed PAI as a competitor of Mack. The evidence presented at the hearing also clearly demonstrated PAI was one of Mack's largest competitors. Although PAI also purchased parts from Mack dealers, which Toledo Mack uses to claim PAI is a "customer," the evidence also clearly established that many of the part purchases from PAI were single-item purchases and "samples" that were implicitly for the purpose of reverse engineering to manufacture competitive parts.
 {¶ 29} Also, Toledo Mack's argument that Yuzuick gave explicit permission to Toth during a phone call that MACSPEC 2001 could be sold to "customers" is unpersuasive at best, as Yuzuick's authorization was meaningless given Toledo Mack's intentionally deceptive omission of the fact that the customer it had in mind was PAI. Toth candidly admitted at the hearing that he would not have been comfortable telling Yuzuick that the customer in mind was PAI because PAI is a competitor. The deliberate omission of PAI's identity by Toth is deafeningly telling. Thus, we concur with the trial court's comment in the present case that Toledo Mack's claim that it believed "customer" included one of Mack's largest competitors "rings hollow," and we find Toledo Mack's assertion wholly unconvincing.
 {¶ 30} In addition, although Toledo Mack attempts to argue that GGS's delivery of a MACSPEC 2001 disk to "Nancy's Trucking" without checking to see if "Nancy's Trucking" was on the approved list is evidence that Mack did not make reasonable attempts to keep the MACSPEC 2001 program confidential, it is important to note that GGS sent "Nancy's Trucking" only a single disk out of the 27-disk set, and Bill Black believed at the time the disk was merely a replacement disk for a damaged disk. Also, Black never gave out the unlock code, and he testified that a single disk would have been useless to someone who did not already have MACSPEC 2001. Yuzuick also related an incident in which someone called for an unlock code claiming to be a dealer from New York City, but when the person could not verify information, he refused to give an unlock code and told GGS not to give the code to this person. Thus, we find GGS's delivery of a single disk to "Nancy's Trucking" without checking the approved list did not demonstrate Mack's failure to take reasonable efforts to keep the information on the MACSPEC 2001 confidential.
 {¶ 31} At trial, Toledo Mack also attempted to argue that Mack's failure to keep the MACSPEC 2001 information confidential was evidenced by the fact that it gave Ryder Truck Company copies of the system even though it is not an authorized dealer. However, although Yuzuick admitted Mack had given Ryder access to the system, he explained that Mack gave Ryder only eight of the 27 disks, and Ryder received only the disks that had information that referred to its specific trucks. Yuzuick also explained that Ryder is a trucking company that purchases Mack trucks and is not a competitor or in the business of selling truck parts.
 {¶ 32} We disagree with the trial court's conclusions as to whether the MACSPEC 2001 was a trade secret and find the trial court abused its discretion in its determination of such. The trial court seemed to find that the MACSPEC 2001 system was not a trade secret based solely upon the reason that Mack failed to safeguard the information contained in the system, citing the failure of Mack's tracking procedure and unlock code system to keep PAI from using MACSPEC 2001. However, Toledo Mack's and PAI's resourcefulness and ingenuity in getting around a system indisputably designed to permit only authorized usage of the computer program cannot turn a trade secret into public domain. In this respect, the trial court abused its discretion in finding the board's order was supported by reliable, probative, and substantial evidence, and was in accordance with law.
 {¶ 33} Therefore, the MACSPEC 2001 was a trade secret that was subject to confidentiality by Toledo Mack. The information in the MACSPEC 2001 system was not known outside of the Mack corporation; Mack took reasonable precautions to guard the secrecy of the information through its unlock procedure administered by GGS; it was extremely valuable for Mack to keep from competitors because it gave Mack the advantage of being able to instantly find the assembly and parts details for every unique Mack truck; Mack spent $34 million developing the system; and the expense and difficulty for others to duplicate the information would be immense, given the complexity and specific uniqueness of every Mack truck sold. Further, it was this immense expense and difficulty in reproducing the information contained in the MACSPEC 2001 system that made the system so valuable to both Mack and any competitor. The evidence also clearly established that Mack took reasonable efforts to maintain the secrecy of the information contained in the MACSPEC based upon the value it would provide to a competitor. As we have found that Toledo Mack divulged Mack's trade secret by giving the MACSPEC 2001 system to PAI, Mack established good cause for termination of the franchise agreement pursuant to R.C. 4517.55, Monte Zinn Chevrolet, andChesapeake Ford, supra, and we need not address Mack's arguments with respect to the price lists and microfiche. Therefore, Mack's first assignment is sustained.
 {¶ 34} Mack argues in its second assignment of error that the trial court erred in finding that Toledo Mack's offensive use of Mack's trademark in advertising was not good cause for the franchise termination. Mack argues in its third assignment of error that the trial court erred in finding that several express R.C. 4517.55(A) factors did not also support Mack's termination of Toledo Mack. As we have found Toledo Mack's distribution of the MACSPEC 2001 system to PAI constituted good cause for termination of the franchise agreement, Mack's arguments in its second and third assignments of error seeking to establish good cause are moot.
 {¶ 35} Accordingly, Mack's first assignment of error is sustained, Mack's second and third assignments of error are moot, and the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court with instructions to reverse the order of the board.
Judgment reversed; cause remanded with instructions.
Petree and McGrath, JJ., concur.